# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs January 21, 2016

## STATE OF TENNESSEE v. JABARI REYNOLDS

### Direct Appeal from the Criminal Court for Knox County
### No. 102170   Steven W. Sword, Judge

_____

### No. E2015-00499-CCA-R3-CD – Filed March 9, 2017

_____

The Appellant, Jabari Reynolds, was convicted by a Knox County Criminal Court Jury of first degree premeditated murder, and he was sentenced to life imprisonment. On appeal, the Appellant contends that the trial court erred (1) by allowing a police officer to testify regarding recordings of telephone calls the Appellant made while in jail instead of requiring a telephone company employee to authenticate the calls, (2) by refusing to instruct the jury on voluntary intoxication, (3) by refusing to give a special instruction that the lesser-included offense of second degree murder was "homicide in the 'heat of passion' without adequate provocation," and (4) by accepting the jury's verdict as thirteenth juror. The Appellant also contends that he is entitled to relief due to cumulative error. Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

Gerald L. Gulley, Jr., (on appeal), and Bruce A. Alldredge and Joe Lodato (at trial), Knoxville, Tennessee, for the Appellant, Jabari Reynolds.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Charme Allen, District Attorney General; and TaKisha M. Fitzgerald, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The Appellant's conviction stemmed from the shooting death of the victim, Desean Lowe, following an allegation by the Appellant's girlfriend that the victim had raped her.

Waynisha Hamilton testified that she had known the victim since kindergarten. Hamilton said that they were friends and that she thought of the victim as her brother. In May 2013, she moved into a one-bedroom apartment in the Arbor Place Apartments complex, and the victim lived with her.

Hamilton said that she met the Appellant in March 2013 and that he began staying with her on July 1. The victim spent the night of July 1 with his mother in Rocky Top, and he returned to Hamilton's apartment on July 2. On the night of July 2, the Appellant stayed in the living room, and Hamilton and the victim were in the bedroom, "hanging out" and smoking marijuana.

On the afternoon of July 3, the Appellant, Hamilton, and the victim were in the living room smoking marijuana when the Appellant received a call from his girlfriend, Briasha Williams. The Appellant's cellular telephone was loud, and Hamilton heard the conversation. Williams told the Appellant that the victim had raped her, that the Appellant was "up there with her enemies," and that she was "going to be laughing when [the Appellant] come up dead." While the Appellant was still conversing with Williams, Hamilton and the victim told the Appellant that the victim had not raped Williams.

Hamilton said that after the call, she and the victim went to "Dajauna's house." When they returned a short time later, the Appellant was sitting on the couch in the living room. Hamilton began sweeping the living room floor. The Appellant got up, walked behind the couch, and stared at Hamilton. She asked the Appellant, "'What's on your mind? Are you good?'" The Appellant responded either "'[y]eah'" or "'nothing.'" After she finished sweeping, Hamilton walked into her bedroom. The victim came into the bedroom and said that he was leaving. Hamilton responded that she would leave with him. She walked into the living room and saw the Appellant sitting on an ottoman in front of a chair. She told the Appellant that he had to leave the apartment "[be]cause we ain't on no type stuff for Briasha," and he said, "[O]kay."

Hamilton walked back to her bedroom, and the Appellant followed her. The victim was standing facing the bedroom closet near the window. The Appellant pulled out a gun and began firing. The first shot hit the window, but the next shot hit the victim. Hamilton ran into the bathroom, hid, and heard the Appellant call her name before she heard more shots fired. She said that after the shots ceased, she heard the front door close. She waited in the bathroom until she was certain the Appellant was gone then ran into the bedroom. She saw the victim lying on his stomach on the side of her bed. She called his name, and he lifted his head. He was covered with blood.

Hamilton said that she ran to a neighbor's apartment, asked for help, returned to her apartment, and called 911. While speaking with the 911 dispatcher, she walked into the living room and "flipped the TV over." She said she did not know why she turned the television over. She remained on the telephone with 911 until the police arrived. Thereafter, she went downtown with the police to be interviewed.

On cross-examination, Hamilton said that on the night of the shooting, she also overheard the Appellant's telephone conversation with Donna Locklin, Williams's mother. Locklin told the Appellant that Williams had said previously that she had been raped by the victim. Hamilton denied that the Appellant said he would leave and needed his toothbrush or that she went into the bedroom to retrieve his toothbrush. Hamilton said that the victim kept his clothes in the bedroom closet.

Hamilton could not recall how many shots she heard while in the bathroom but thought it was "[a]bout four." She said that she turned the television over because she was frustrated she could not get help for the victim.

Hamilton said that the victim and the Appellant did not fight prior to the shooting. She had never seen the gun before that night and was unfamiliar with guns; however, she recalled that the Appellant's gun was silver. She acknowledged telling the 911 operator that "some guy named Jabari did it." She said that she knew the Appellant but did not know his last name. She acknowledged that she "hate[d]" the Appellant for killing the victim.

Michael Alan Mays testified that he was the records keeper for 911 in Knox County. Mays said that every call into 911 was audio recorded. Information from each call was entered in to a computer, which then created a Computer Aided Dispatch (CAD) report. Mays said a CAD report reflected that four calls regarding the incident came into 911. The first call was at 7:56 p.m. on July 3, 2013, from a location on South Hall of Fame Drive in Knoxville. The calls were played for the jury.

Knoxville Police Officer James Lockmiller testified that on the night of July 3, 2013, he and Sergeant Jonathan Chadwell were working as security officers for Wood Properties and were on patrol between Arbor Place Apartments on South Hall of Fame Drive and Ridgebrook Apartments off of Western Avenue. While in "parking lot B" of Arbor Place, they received a report of shots fired at apartment 398.

They went to the apartment and saw a female sitting on the steps outside the apartment and crying. They attempted to talk with her, but she was upset and "not very coherent." The officers went inside the apartment and discovered a deceased male lying face down on the floor of the back bedroom. The victim's injuries were consistent with

gunshot wounds. Crime scene technician Beth Goodman arrived and began photographing and documenting the scene.

On cross-examination, Officer Lockmiller said that when he entered the apartment, he walked through the area that encompassed the living room, dining room, and kitchen. He thought the television in the living room might have been overturned but could not recall any other disruptions. He then walked down a short hallway and into the bedroom. He noted that the apartment's only bathroom was located in the bedroom. Officer Lockmiller did not see the Appellant on the night of the offense.

Beth Goodman, who worked in the Knoxville Police Department's forensics unit, testified that she went to the scene; met with her supervisor, Sergeant Bryan Dalton; then began taking photographs of the apartment. Goodman and Sergeant Dalton examined the back bedroom and took measurements. The victim's body was located between the bed and the wall next to a window. Goodman noticed that a bullet had passed through the curtain, blinds, and window glass at a point approximately four feet, six inches from the floor. She found no other bullet holes. The only blood in the room was on the wall next to the window. Goodman left the apartment and collected a tube of toothpaste and a toothbrush that were found in the stairwell outside the apartment.

Goodman said that the next day, July 4, she went to the medical examiner's office and retrieved the victim's clothing. She also retrieved three bullets that were removed from the victim's body during an autopsy. Goodman said that she "confiscated" one unfired bullet and a box containing a revolver but did not say when or where the items were confiscated.

Knoxville Police Officer Eric Heitz testified that around 11:00 p.m. on the night of the shooting, he received a report of a suspicious person at 230 South Hall of Fame Drive. Officer Heitz went to The Vistas Apartments complex, which was located "back to back" with Arbor Place Apartments and saw the Appellant sitting on the ground in front of apartment 228, talking on a cellular telephone. Officer Heitz asked the Appellant what he was doing there, and the Appellant responded that he was waiting for his girlfriend. The Appellant had no identification but said his name was "Jabari." Officer Heitz recalled that the police had issued a be on the lookout report (BOLO) for someone by that name earlier in the evening. At Officer Heitz's request, the Appellant ended his call, telling the person with whom he was speaking, "'I've got to go, Mom. They've got me.'"

Officer Heitz handcuffed and patted down the Appellant. He found a Taurus revolver in the Appellant's right front pocket. The revolver was loaded with one live .38 caliber round, and it held five expended cartridges. In the Appellant's left front pocket,

Officer Heitz found a large plastic baggie containing eight, smaller Ziploc baggies which in turn contained a green leafy substance that appeared to be marijuana.

On cross-examination, Officer Heitz clarified that the Appellant "was sitting on the ground against the retaining wall opposite the door to Apartment 228." The area was well-lit, and the Appellant was dressed in black clothes. Officer Heitz heard the Appellant speaking on the telephone but was unable to "tell if there was any emotion in the conversation or anything." The Appellant was compliant when Officer Heitz took him into custody. Officer Heitz explained that Townview Drive ran around three apartment complexes: Arbor Place, Townview Towers, and The Vistas. He said that it took five minutes to walk between the apartment complexes.

Lisa Knight, the director of the Tennessee Department of Safety and Homeland Security's handgun program, testified that the Appellant had never applied for a handgun carry permit.

Teri Arney, a special agent forensic scientist with the Tennessee Bureau of Investigation's (TBI) crime laboratory, testified as an expert in firearms examinations. Agent Arney tested the revolver taken from the Appellant. Agent Arney explained that the cylinder on the revolver held a maximum of six bullets. After a bullet was fired, the cartridge case was left inside the cylinder.

Agent Arney said that one unfired .38 caliber hollow-point bullet and five fired cartridge casings were in the revolver when it was confiscated. The bullet and the fired cartridge casings were removed by the police and submitted to her office. Agent Arney determined that all five cartridge casings were fired from the Appellant's revolver. Agent Arney also tested one bullet and two bullet fragments that were retrieved from the victim's body during autopsy and determined that all three had been fired from the Appellant's revolver.

Agent Arney examined the clothing that was removed from the victim's body prior to autopsy. She found no holes in the front of the shirt. On the back of the shirt, she found four holes: the first was near the seam of the right shoulder, the second was a few inches down and toward the center of the shirt, the third was directly below the second, and the fourth was in the lower back area around the center of the shirt. In the side seam, she found a small hole that may have been a rip or tear.

On cross-examination, Agent Arney explained that "every time you fire the revolver, the hammer returns to the at-rest position. So your choices at that point are to manually cock the hammer to fire it in single action or to simply pull the trigger and fire it in double action." Three and three-quarters pounds of pressure were required to fire the revolver in single action, and "a little" over twelve pounds of pressure were required for

double action.  She had no way to discern whether the revolver was fired in single or double action.

Agent Arney said that because no gunshot residue was found on the victim's clothes, she was unable to estimate the distance from which the shots were fired.  She said that the fired bullets and the unfired bullet "appeared to be the same type and design."

Colin McLeod, an investigator with the violent crimes unit of the Knoxville Police Department, testified that on the evening of July 3, he heard a radio report of a shooting with an unresponsive victim and proceeded to the scene.  Several officers were present when he arrived.  Hamilton, who was "extremely distraught," was speaking with some officers.  Investigator McLeod arranged for Hamilton to be transported to the police department for an interview.

He then walked into the apartment and saw members of the Knoxville Fire Department and Rural/Metro, an emergency medical service, attempting to revive the victim, but he was deceased.  After the crime scene investigators arrived, Investigator McLeod followed them and examined the scene.  The victim's body was lying on the floor between the bed and the wall.  He appeared to have injuries to his face, the back of his head, and multiple gunshot wounds to the back.  The police found no gun or shell casings at the scene.

While at the scene, Investigator McLeod learned that Hamilton had said the shooter's name was Jabari and that his girlfriend was Williams.  She later identified the Appellant from a photograph lineup.  The police broadcast a BOLO for the Appellant, which stated that he was wearing a black or dark hoodie and black pants or long shorts.  Investigator McLeod left the scene to return to his office.  En route, he was notified that a suspect had been apprehended at The Vistas.  Investigator McLeod drove to The Vistas and arrived as the Appellant was being placed into custody.

The Appellant was taken to police headquarters and placed in an interview room.  Investigator McLeod began to interview the Appellant at 12:14 a.m. on July 4, 2013.  Investigator McLeod advised the Appellant of his Miranda rights, and the Appellant signed a waiver of his rights.  Investigator McLeod said that during the initial part of the interview, the Appellant "hemmed and hawed a little bit."  The Appellant then said he would tell what happened if he could have a cigarette.  Investigator McLeod gave the Appellant a cigarette and took him to the sally port to smoke.  A recording of the interview was played for the jury.

The recording reflects that the Appellant said he was not staying at Hamilton's apartment and was there that day to visit Hamilton.  He said he had been in the apartment

for approximately ten minutes. He first said that Williams had told him about the rape two months before the shooting then stated that she had told him about it a week after it happened. He thought the rape happened some time the previous year. He stated that he and the victim began fighting in the living room and that the fight continued into the bedroom. During the fight, the victim hit him in the jaw. He denied that the gun was his, stating that the victim took the gun from a bedroom closet and that he got the gun after knocking it from the victim's hand. He acknowledged taking the gun with him when he left the apartment.

The Appellant told Investigator McLeod that before the shooting, he had a "three-way" call with Williams and her mother. During the call, the Appellant's cellular telephone was "on speaker." Williams accused the victim of sexually assaulting her several months earlier, maybe the previous October. The Appellant asked Williams, "'What do you want me to do? I'm staring right at him.'" The Appellant said that he and the victim began fighting on the couch in the living room. The victim produced a gun, and he and the Appellant fought for it. The Appellant knocked the gun from the victim's hands and shot at him. The Appellant said that the victim went to the closet for a gun. The Appellant fought the victim, took the gun, and shot at him in the bedroom. Investigator McLeod did not see any injuries to the Appellant.

Investigator McLeod said he learned that Locklin was Williams's mother. He spoke with Locklin but never spoke with Williams. Investigator McLeod was unable to find a report by Williams or Locklin concerning the alleged rape.

On cross-examination, Investigator McLeod said that the Appellant's clothing, which was dark gray or black, matched the description of the suspect's clothing. Investigator McLeod did not notice any stains on or damage to the Appellant's clothes, and the police did not take his clothes.

Investigator McLeod clarified that he was at the scene while it was processed. He then left the scene, spoke with Locklin, left Locklin, and was en route to police headquarters when he was advised the Appellant had been apprehended. He estimated that the Appellant was found a couple of hours after Investigator McLeod left the crime scene. When Investigator McLeod arrived at The Vistas, the Appellant was being taken to a patrol car.

Investigator McLeod said that Officer Heitz and Investigator Madison were also present in the sally port with the Appellant and him. Investigator McLeod recalled that during the interview, the Appellant said that he and the victim fought in the living room and the bedroom. Investigator McLeod asked the Appellant numerous questions about the incident "to see if the story would change." He maintained that the Appellant first

said that the fight began in the living room then stated the fight began in the bedroom. Investigator McLeod thought the Appellant was describing "two separate events."

Investigator McLeod said that after the interview, he thought that the Appellant "had known for some time" Williams had been sexually assaulted by the victim and that it was confirmed during the telephone conversation immediately before the shooting. Investigator McLeod said the Appellant never acknowledged that he knew "the entire time" that the victim was the alleged rapist; instead, the Appellant maintained that he "barely knew" the victim and "only knew his first name." The Appellant said he "went for" the victim after he got the gun from the closet. They had a physical altercation, during which the gun was knocked from the victim's hand. At that point, the Appellant picked up the gun.

Investigator McLeod said that the Appellant asserted the gun did not belong to him. The Appellant said that he did not leave the apartment with a toothbrush and toothpaste and did not know how those items came to be in the stairwell.

Investigator McLeod said that Locklin described Williams as "very volatile." Investigator McLeod asserted that he "never knew any of the background behind" the alleged rape.

On redirect examination, Investigator McLeod said that he did not know whether the rape allegations were true or false.

Lieutenant Steven Patrick with the Knox County Sheriff's Office testified that he was the intake director and keeper of records for the Knox County Jail. Lieutenant Patrick said that he also "maintain[ed] the records for the jail phone calls." Lieutenant Patrick said each inmate was given a unique identification number that had to be entered when the inmate made a telephone call. Each call was recorded, and the recordings were kept on servers at Pay-Tel in Greensboro, North Carolina. In order for Lieutenant Patrick to retrieve a recording, he "would log into a secure web server and download the calls directly from them to [his] computer."

Four of the Appellant's jail calls were played for the jury. In the first call, the Appellant spoke with an unidentified male. The men discussed whether the Appellant should accept a plea bargain if the State should offer one. The male said that it was the Appellant's "word against hers," meaning Hamilton. The Appellant disputed that assertion, saying the police had found him with the gun.

In the second call, the Appellant spoke with a woman, later identified as Williams. They spoke about the length of sentence the Appellant could receive for the offense. Williams said that the Appellant should have asserted an insanity defense because he was

"crazy." The Appellant laughed and said, "I'm not a girl but I should have killed that b[**]ch, man, I should have killed that old man, f[**]k that s[**]t." Williams responded, "That's how I know you crazy. . . . You saying all that on the phone." The Appellant said, "They already got me. . . . What else can they do to me? . . . [T]hey going to throw me in jail?"

During the third call, Williams asked how the police found the Appellant, and he responded that he was sitting in the hallway. She said, "Didn't I tell you to get away from there, though?" They then discussed a photograph she sent the Appellant, which showed her and another man. She told him she sent the picture to make the Appellant mad and explained it was "nobody." The Appellant told Williams that she had made him "snap." She asked, "What?" The Appellant responded, "You know what." He told her, "The rest of the s[**]t you was saying was really f[***]ed up." The Appellant and Williams argued about whether she had been unwilling to speak with the Appellant, apparently referencing their telephone conversation prior to the shooting. The Appellant then said, "I don't know. I was high and I was confused and I was kind of like what the f[**]k. It felt like my back was against the wall." He said he felt he had no choice but to "do what [he] did." She asked why the Appellant talked to the victim after she told the Appellant to stay away from him. The Appellant said that he did not talk with the victim, asserting, "I didn't even know that was him." He said that he was not friends with the victim and that Hamilton, who was friends with the victim, brought him around the Appellant. Williams asked if Hamilton "had already known what I told you?" The Appellant responded, "Nah." Williams asked where Hamilton was when she told the Appellant what the victim did to her, and he replied that he did not know where Hamilton was at that time. The Appellant said that the victim was in Hamilton's apartment. Williams reiterated, "Didn't I tell you to get away from him?" The Appellant responded, "No. At . . . the last moment when I found out that was him that you was talking about." He said the revelation the victim was the rapist was "unexpected." The Appellant said that "Chief Keef"[1] began playing in his head. The Appellant said that he went up to "that motherf[**]ker and hit his ass with it." Williams asked if the Appellant hit the victim with the gun, and the Appellant said that he shot the victim but did not hit him. The Appellant said that he shot the victim four times and that the shots hit the victim in the face, in the back of the head, and in the back.

In the fourth call, the Appellant told Williams that Hamilton had testified against him in court. The Appellant thought a better attorney could negotiate a conviction of second degree murder or manslaughter. Williams said that she did not know why the Appellant was charged with first degree murder because "it wasn't premeditated." After a drawn out pause during which the Appellant made an "mmmm" sound, the Appellant said, "Nah. Nah. It really wasn't." The Appellant said that Hamilton had "switched" the

---

[1] Chief Keef is a rapper.

story. He theorized that Hamilton's testimony was not credible because she admitted she and the Appellant were smoking marijuana before the shooting. He opined that Hamilton could have been "hallucinating." He asserted that Hamilton knew the Appellant had the gun in the apartment "the whole time." The Appellant put the gun "under the couch." He said that he told Hamilton, who was sitting on the couch, to move, and he "grabbed the gun under" Hamilton. The Appellant said he confessed because the police had "the gun and the body."

Dr. Steven Cogswell testified that he was the deputy chief medical examiner in Knoxville in July 2013 and that he performed an autopsy on the victim's body. Dr. Cogswell said that he performed a preliminary examination of the body and noticed blood spatter on the victim's shorts and underwear. After the victim's clothes were removed, the only injuries Dr. Cogswell noticed on the front of the victim's body were to the face. Notably, the victim had no "defensive injuries," such as bruises, cuts, or scrapes to his forearms or hands, to indicate he had engaged in a fist fight. The victim had a gunshot wound to his upper lip. Dr. Cogswell opined that the victim was "in the upright position" when he received the gunshot wound to the face.

Dr. Cogswell found that one gunshot entered the back of the victim's head. Dr. Cogswell found three entrance gunshot wounds and one exit wound in the victim's back. Because of the absence of soot or stippling, he could not estimate definitively the distance from which the shots were fired but opined the distance was greater than three feet. One of the bullets struck the victim's liver and heart, and another went into his brain. Dr. Cogswell found blood in the right side of the victim's chest, suggesting that the victim survived at least one minute after the bullet pierced his heart. Because of the amount of blood in the abdomen, Dr. Cogswell believed the gunshot wound to the head was the last to occur.

Dr. Cogswell surmised that the victim was bending down or forward when he was struck in the shoulder, head, and lower back. Dr. Cogswell found a bullet and fragments inside the victim's head and two bullets and fragments in his chest.

Donna Locklin testified on the Appellant's behalf. She said that she had known the Appellant for approximately seven years and that they had a "good relationship." They met when Locklin lived in Chattanooga. The Appellant dated Locklin's daughter, Williams, who was fourteen or fifteen years old. Locklin and Williams moved to Knoxville because of Locklin's job. After the move, Williams and the Appellant were unable to see each other as often as they had before the move. When the Appellant "was old enough to start coming up" to Knoxville, the Appellant and Williams began seeing each other more frequently. Locklin said that the Appellant and Williams dated "on and off" and that in July 2013, "[t]hey were on."

Locklin said that on July 3, 2013, the Appellant called Locklin and asked whether Williams had been "sexual assaulted." The Appellant said, "'Tell me it's not true.'" Initially, Locklin was confused and asked the Appellant to explain. The Appellant said that Williams recently had told him she had been "'messed with.'" Locklin responded that while she was in Nashville for a meeting, Williams had called and said that she had been sexually assaulted. The Appellant said, "'Oh, man,'" and hung up.

Locklin said that the Appellant sounded upset and that his voice was "shaky," as if he were about to cry. She thought the Appellant was bothered that Williams had not told him about the assault when it happened. Locklin testified that she thought Williams had not told the Appellant earlier because "it was just a family thing" and that "it wasn't something that she wanted to share." Locklin said that the Appellant "found out from somebody else."

Locklin said that a week before the shooting, the Appellant had stayed at her house for a couple of days. Locklin's four sons and Williams also lived with her. Locklin's house had three bedrooms, and the Appellant slept on a couch in a back room. She did not know where the Appellant went when he left her house. When the Appellant called on July 3, she did not know he was at the victim's apartment. She said that she would have told him to leave because it "wasn't a safe place for him to be."

On cross-examination, Locklin said that the rape occurred shortly before Halloween 2012 while Williams was spending the night at Zanay Stephenson's residence. Locklin spoke with Stephenson and learned that Stephenson "was in the bedroom when it happened." Stephenson told Locklin the assailant's first name was "Sean," but she did not know his last name. Locklin advised Williams to report the rape to the police, but Williams refused. Locklin explained that she understood why Williams did not report the rape, maintaining that the accusation would cause "drama" because Williams did not know the assailant's full name or address. Locklin also did not report the rape. When asked if Williams was "still upset about the rape," Locklin responded, "No. She had moved on." Locklin said that Williams had left Knoxville and was in counseling.

Locklin said that the day after the rape, some "girls and guys" "kicked . . . [the] door in" at Stephenson's residence and "jumped" Williams. Locklin, who had picked up her sons and was coming to pick up Williams, arrived at Stephenson's residence around the same time the "girls and guys" were leaving. As the "girls and guys" left, they ran toward Locklin's sons, who apparently had gotten out of Locklin's car. The two groups exchanged gunfire. After the conclusion of the shooting incident, Locklin took her children home. Upon further questioning, Locklin conceded that she was in the car, did not see the altercation, and had never seen the victim but that Williams told her the victim was one of the shooters.

Locklin said that although the Appellant did not live at her house, he had "visit[ed] for periods of time" on several occasions. When Locklin spoke with the Appellant on July 3, he said that he learned about the rape earlier that day.

Locklin acknowledged she told Investigator McLeod that the Appellant and Williams were arguing during a "three-way" telephone call that occurred before the Appellant called Locklin to confirm Williams's rape allegations. Locklin said she initiated the "three-way" call because Williams had changed her telephone number, the Appellant did not know the new number, and the Appellant called Locklin in an attempt to contact Williams. Locklin acknowledged telling Investigator McLeod that Williams did not know who raped her. She explained that she meant Williams knew only the assailant's nickname, which was "Sean." Locklin said that she and Williams had been looking for the assailant. When they discovered "all his information," they planned to tell the police "so that he could be prosecuted to the fullest extent of the law." Locklin said she had called the Knoxville Police Department on the night of the offense but did not reveal Williams's name or make a police report. Locklin merely asked "what we should do." The police told her that nothing could be done without knowing the assailant's name. Locklin said Stephenson reported to the police that her door had been kicked in.

On redirect examination, Locklin stated that on the night of the rape, she learned that the rapist was someone named "Sean" but that she never heard the name "Desean." Until the shooting, she did not know the victim was the alleged rapist. Locklin said that in October 2012, Williams was seventeen years old.

Locklin said that after she established a "three-way" call with the Appellant and Williams, she put the telephone down so the Appellant and Williams could talk privately. Locklin maintained that Williams changed her telephone number frequently.

The Appellant testified that in July 2013, he was nineteen years old and that he had grown up in Chattanooga. After he moved to Knoxville, he stayed at Locklin's house for a couple of days but left because the house was crowded. He approached a friend named Ray,[2] whose apartment was located in a building near Hamilton's apartment. Ray said that the Appellant could not stay with him because Ray had only one bedroom and he "had a bunch of kids there." The Appellant left Ray's apartment and saw Hamilton and the victim. The Appellant said that he did not know the victim and that Hamilton did not introduce the victim. The Appellant asked Hamilton if he could stay with her, and she agreed.

_____

[2] The Appellant did not know Ray's last name.

- 12 -

The Appellant said that he stayed at Hamilton's apartment for three days and that he slept in the living room. Hamilton sometimes slept on the couch, and the victim always slept in the bedroom. On July 3, the Appellant smoked seven or eight marijuana "blunts" but did not specify when.

The Appellant said that Hamilton, the victim, and he were together most of the afternoon of July 3. The Appellant received a call on his cellular telephone from Williams. Williams asked the Appellant where he was and what he was doing. He responded that he was at Hamilton's apartment and that they were smoking marijuana. Williams asked if Hamilton "was around a guy named Sean." The volume on the Appellant's telephone was "turned all the way up . . . [l]ike it was on speaker, but it wasn't." The victim heard the question and responded, "'That's me.'" The Appellant said that at that time, he had not known the victim's name and only knew that Hamilton referred to the victim as her brother. Williams told the Appellant, "'Baby, he raped me. . . . Sean raped me, baby.'" The Appellant said that Williams's voice was calm. The Appellant "got quiet" and said, "'He didn't rape you.'" Williams began to get emotional, and her voice got softer. She insisted that the victim raped her. When the Appellant expressed disbelief, Williams cried and asked why the Appellant was "taking [the victim's] side." Williams screamed, "I'm changing my number, and I hate you," and she ended the call. The Appellant said that a "machine came on. Said [the] number wasn't valid or something." Hamilton and the victim laughed, said Williams was lying, and denied that the victim had raped Williams. Hamilton and the victim then left the apartment.

The Appellant said that after they left, Williams sent the Appellant text messages and called him from "Florida numbers," saying that she was the Appellant's girlfriend and could not believe the Appellant was siding with the victim. Williams asked why the Appellant did not believe her. She was crying and screaming. The Appellant said that he "was high," had "a lot of emotions running through" him, and was confused.

The Appellant said that Hamilton and the victim returned to the apartment, and the victim went into the bedroom. Hamilton went into the bedroom then walked into the living room. She asked the Appellant if he was okay. The Appellant did not respond. When the victim came into the living room, the Appellant called Locklin. The volume on his cellular telephone was still loud. The Appellant asked if Locklin knew about a rape involving Williams. Locklin responded that Williams had called one night and said that she had been raped. The Appellant asked Locklin if the rapist was someone named "Sean," and Locklin said, "Yes." The Appellant said that he did not know about the rape before that day. After the Appellant's call with Locklin ended, the victim looked at the Appellant, asked, "'You want some bull[***]t," and then walked into the bedroom. The Appellant testified that the victim was "rude" and was "being an [***]hole."

The Appellant said that at that time, "it was just so much confusion and upset, and emotions is running through me. I can't really explain it. It was just – it felt – I just felt like I was being tore, pulled different ways." The Appellant was angry with himself for not immediately believing Williams. After the call with Locklin, however, the Appellant believed that the victim had raped Williams.

The Appellant said that he was "upset" with the victim. Hamilton told the Appellant to leave, and she walked into the bedroom. The Appellant said that he had a toothbrush and toothpaste in the bathroom and that he thought Hamilton was "fixing to get my stuff." After the shooting, he did not, however, leave the apartment with his toothbrush or toothpaste.

The Appellant said that when Hamilton and the victim went into the bedroom, his gun was under the couch cushion. He said that when he began staying at the apartment, Hamilton did not want the gun "out," so he gave it to her, and she put it under the couch cushion. After Hamilton went into the bedroom with the victim, the Appellant got the gun and walked just past the doorway into the bedroom. The victim was standing near the closet by the window, and Hamilton was in the bathroom. When the Appellant began shooting, Hamilton locked the bathroom door. The Appellant fired four or five shots. When asked where the victim was struck, the Appellant explained, "I know one [bullet] hit his cheek. He turned around. Some more [bullets] hit him in the back, and he fell, and I ran."

The Appellant said he ran "[d]own the street" and through the walkways of other apartment buildings. His gun was in his pocket, and he did not do "anything with the bullets." The Appellant agreed that Officer Heitz found him in the stairwell while he was on the telephone talking to his mother. The Appellant acknowledged telling his mother, "'I've got to go. They got me.'"

The Appellant acknowledged he told Investigator McLeod that before he spoke with Williams immediately prior the shooting, he already knew the victim had raped Williams. He further acknowledged he first told Investigator McLeod that "it happened in the living room, and [he] told [Investigator McLeod] that it happened in the bedroom." The Appellant could not remember if he had described the fight as continuous or two separate fights. Additionally, he told Investigator McLeod that he took the gun from the victim. The Appellant conceded he told Investigator McLeod that he was not involved in the shooting. The Appellant testified, however, that he and the victim did not fight and that the victim never had a gun. The Appellant said that the gun, a .357, belonged to him. He explained that he lied because he was scared and "didn't want to face up to the consequences" of what he had done. The Appellant asserted that he was telling the truth at trial.

- 14 -

The Appellant said that his use of marijuana was "an on-and-off thing." He had smoked seven or eight "blunts" that day and was "high." The marijuana made him feel confused. The Appellant said that he did not intend to kill the victim but that he was upset and shot the victim because "[h]e raped my girl."

On cross-examination, the Appellant conceded that on May 17, 2013, while he was staying with Locklin and Williams, Williams falsely accused him of committing a crime. Nevertheless, he believed Williams's subsequent claim that the victim had raped her because the accusation was confirmed by her mother, Locklin. The Appellant acknowledged that Locklin was not present when the alleged rape occurred. He further acknowledged he told Investigator McLeod that Williams had told him about the rape allegation a couple of weeks after the rape; however, the Appellant asserted that was a lie and that he first found out about the rape on the day of the shooting.

The Appellant said that the victim was not present the first night the Appellant spent at Hamilton's apartment. The victim arrived the second night. He and the victim did not talk much.

The Appellant said that after he was incarcerated, he called Williams. During one of their conversations, the Appellant said he was thinking about a song by a rapper named Chief Keef. The Appellant said that the name of the song was "She said she loved me." Williams told the Appellant that she was leaving him because he had not believed her claim that the victim raped her, and she sent him a photograph of her hugging another man. Later, Williams told him that the man "wasn't nobody" and that she took a photograph with the man because she liked his car. During the conversation with Williams, the Appellant said, "'Chief Keef was playing in my head, and then I pulled out that mother f[****]r and hit his ass with it.'"

The Appellant conceded that he did not have a permit for his gun.

The Appellant said that he was sitting on the floor in the living room while speaking with Locklin. After the conversation ended, the victim acted "pretty jerky." The Appellant acknowledged that he could have left immediately after Hamilton told him to leave. Instead, he reached over and got the gun from underneath the couch cushion. After getting the gun, he "hopped up" and walked to the bedroom. The victim was facing the Appellant, and the victim "glance[d]" at the Appellant. The Appellant shot him, and the bullet hit the victim's face. The victim turned, and the Appellant repeatedly shot the victim in the back. The victim fell to the floor.

The Appellant acknowledged that he shot the victim in the back and in the back of the head. He also acknowledged that the victim was unarmed.

Based upon the foregoing, the jury found the Appellant guilty of the first degree premeditated murder of the victim, and he was sentenced to life imprisonment. On appeal, the Appellant contends that the trial court erred by allowing a police officer to testify regarding recordings of telephone calls the Appellant made while in jail, by refusing to instruct the jury on voluntary intoxication and to instruct that the lesser-included offense of second degree murder was "homicide in the 'heat of passion' without adequate provocation," and by accepting the jury's verdict as thirteenth juror. The Appellant also contends that he is entitled to relief due to cumulative error.

## II. Analysis

### A. Jail Calls

The Appellant contends that the trial court erred by allowing Lieutenant Patrick to testify regarding the telephone calls the Appellant made while in jail. First, the Appellant argues that Lieutenant Patrick was not the person who maintained the physical custody of the calls. Second, the Appellant asserts that the calls were never properly authenticated. The State responds that the trial court properly admitted the calls.

Our supreme court has stated that "questions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court will not interfere with the exercise of that discretion in the absence of a clear showing of abuse appearing on the face of the record." State v. McCoy, 459 S.W.3d 1, 8 (Tenn. 2014). The trial court's discretion in determining the admissibility of evidence is generally circumscribed by the Tennessee Rules of Evidence.

### 1. Tennessee Rule of Evidence 803(6)

On appeal, the Appellant argues that the trial court erred by allowing Lieutenant Patrick to authenticate the recordings of the jail telephone calls instead of requiring the records keeper from the telephone company. Specifically, the Appellant maintains that Lieutenant Patrick did not maintain physical custody of the recordings of the jail telephone calls; instead, he accessed the calls from the company where the calls were stored, namely Pay-Tel in Greensboro, North Carolina. The Appellant asserts that because Pay-Tel stored the calls, Pay-Tel was the "custodian" for the purposes of Tennessee Rule of Evidence 803(6). The State responds that the trial court correctly found that Lieutenant Patrick was the custodian of the jail telephone calls.

At trial, Lieutenant Patrick testified that he was the intake director and keeper of records for the Knox County Jail and that he "maintain[ed] the records for the jail phone calls." He explained that each inmate was assigned a unique twelve-digit personal identification number (PIN). In order to place a call, the inmate needed to enter his PIN,

say his name, enter the number to be called, and designate whether the call was "a debit call or a collect call." After the number was dialed, the inmate had to wait until the other party accepted the call. The longest call an inmate could make was ten minutes. Each call was recorded.

Lieutenant Patrick accessed the recordings of the Appellant's calls, which were kept on servers at Pay-Tel in Greensboro, North Carolina. He explained that Pay-Tel assigned numbers to identify each call. The first two-digit number was a code for the computer on which Pay-Tel kept the call. The second set of numbers, 5016, was the identification number Pay-Tel assigned to Knox County. The next set of numbers was a computer code. The final numbers were the "date format," which included the four-digit year, month, day, hour, minute, second. Lieutenant Patrick logged onto a secure web server and downloaded the Appellant's calls to his computer. Four of the Appellant's jail calls were played for the jury.

Defense counsel objected to the admission of the recording of the jail calls. At that point, the following colloquy occurred:

> [Defense counsel:] Lieutenant Patrick's already said that Pay-Tel maintains these records. He logs in through a secure server. I would argue that Pay-Tel is the custodian of these records. Lieutenant Patrick can't vouch for the authenticity or any steps Pay-Tel does to maintain the integrity.
>
> [Trial court:] I think when you're dealing with computer files like this, computer records, that the keeper of the record can be the maintainer of the server, but can also be the agency that enters the data, and I know we get these Pay-Tel calls all the time that are routinely recorded down through Knox County Department. . . .
>
> So I think that Lieutenant Patrick is a sufficient custodian of the record. I think he has sufficiently authenticated these records. So I'm going to allow – over your objection, allow the audio to be played.
>
> . . . .
>
> All right. And just – I want to make it clear on the record. The Court's finding was . . . that the records actually are – belong to Knox County Sheriff's Department, that Pay-Tel is just a repository of that, just to clarify.

Generally, hearsay, which is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted," is not admissible at trial. Tenn. R. Evid. 801, 802. Tennessee Rule of Evidence 803(6) provides the following exception to the hearsay rule:

> Records of Regularly Conducted Activity. – A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses made at or near the time by or from information transmitted by a person with knowledge and a business duty to record or transmit if kept in the course of a regularly conducted business activity and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness . . . unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

This court has noted that

> "Rule 803(6) simply provides that the witness be the records 'custodian or other qualified witness.' Typically that witness will be in charge of maintaining records of the particular business, but other employees or officers or appropriately informed witnesses could be used as well. The key is that the witness have knowledge of the method of preparing and preserving the records. If no witness is available to testify, the records cannot be authenticated as business records, unless the parties stipulate to authentication."

State v. Dean, 76 S.W.3d 352, 365 (Tenn. Crim. App. 2001) (quoting Neil P. Cohen et al., Tennessee Law of Evidence, § 8.11[11] (4th ed. 2000)).

This court previously examined this exact issue in State v. Dustin Shawn Price, No. M2012-00117-CCA-R3-CD, 2013 WL 4539034 (Tenn. Crim. App. at Nashville, Aug. 26, 2013). In that case, the defendant had five or six telephone conversations with Bobby Spain while Spain was in jail. Id. at *3. The calls were recorded, and the recordings were stored at "Globel Tel Link." Id. at *8. A police officer testified at trial regarding the recordings of the telephone calls. On appeal, the defendant challenged the

- 18 -

admissibility of recordings "because '[n]o custodian of the company that maintains the jail house recordings testified as the custodian,' which meant that '[t]he admissibility of the evidence did not comply with Rule 803(6).'" Id. On appeal, this court observed the police officer testified "that she and a partner were the custodian of the records of the inmate telephone calls, that they were responsible for pulling the records, and that Global Tel Link was just the company that had 'created the system' for the automatic recording of each inmate's telephone call," and she "agreed that it was analogous to someone using Quicken software to compile their own records." Id. This court held that the police officer's "testimony satisfied the requirement for the admission of the recordings under the business records exception to the rule against hearsay." Id.

In the instant case, Lieutenant Patrick testified that he was the records keeper for the Knox County Sheriff's Office and that he was responsible for maintaining the recordings of the telephone calls placed by inmates at the jail. He testified in detail about the procedures for an inmate to place a call and the manner of recording the calls onto the server. He also testified about how he accessed the calls. The trial court did not err by admitting the recordings under Rule 803(6). See Price, No. M2012-00117-CCA-R3-CD, 2013 WL 4539034, at *8; see also State v. Daniel William Davenport, No. M2005-01157-CCA-R3-CD, 2007 WL 1582659, at *2 (Tenn. Crim. App. at Nashville, May 30, 2007).

## 2. Tennessee Rule of Evidence 901

The Appellant further challenges the admission of the recordings of his jail telephone calls, complaining that Lieutenant Patrick Price did not testify that the voice heard on the recordings was the Appellant's. The State responds that "Lieutenant Patrick properly authenticated the jail recordings under Rule 901(b)(5) by identifying the [Appellant's] voice on the recordings and connecting it to him." The State notes that Lieutenant Patrick also testified that the recordings were made in the Knox County Jail, the Appellant's PIN was used to make the calls, and the Appellant stated his name at the beginning of each call.

Tennessee Rule of Evidence 901 provides that authentication may be made by "[i]dentification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Tenn. R. Evid. 901(b)(5). "For authentication purposes, voice identification by a witness need not be certain; it is sufficient if the witness thinks he can identify the voice and express his opinion." Stroup v. State, 552 S.W.2d 418, 420 (Tenn. Crim. App. 1977). The State asserts that Lieutenant Patrick identified the Appellant's voice. However, from our review of the record, we note that Lieutenant Patrick never testified that he recognized the Appellant's voice.

Nevertheless, this court has previously recognized that identifying a caller's voice "is not the only means by which an audio recording of a phone call may be authenticated." State v. Morris Marsh, No. E2013-01343-CCA-R3-CD, 2014 WL 4366087, at *14 (Tenn. Crim. App. at Knoxville, Sept. 4, 2014). This court explained:

> In State v. Hinton, 42 S.W.3d 113, 127 (Tenn. Crim. App. 2000), a panel of this court held that an audio recording of a 911 phone call had been properly authenticated when the custodian of the recording explained the process by which the recording was "processed and retrieved," stated the time and date of the phone call, and the address associated with the phone number from which the phone call originated.

Id. In the instant case, Lieutenant Patrick described the process for making the telephone calls. The recording reflects that the caller identified himself as "Jabari Reynolds," and the calls were made by an individual with the Appellant's unique inmate number. The trial court found that the recordings were sufficiently authenticated. We agree. See id.; State v. Travis Boyd, No. W2014-00676-CCA-R3-CD, 2015 WL 9426143, at *17 (Tenn. Crim. App. at Jackson, Dec. 23, 2015), perm. to appeal denied, (Tenn. May 10, 2016); State v. Wade Payne, No. W2010-01735-CCA-R3-CD, 2012 WL 134240, at *6 (Tenn. Crim. App. at Jackson, Jan. 17, 2012).

## B. Jury Instruction

The Appellant argues that the trial court erred by refusing to instruct the jury on voluntary intoxication or that second degree murder "is homicide in the 'heat of passion' without adequate provocation."

A defendant has a "constitutional right to a correct and complete charge of the law." State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990). Accordingly, trial courts "should give a requested instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law." State v. Phipps, 883 S.W.2d 138, 150 n. 20 (Tenn. Crim. App. 1994). Moreover, we have previously noted that "[w]e must review the entire [jury] charge and only invalidate it if, when read as a whole, it fails to fairly submit the legal issues or misleads the jury as to the applicable law." State v. Forbes, 918 S.W.2d 431, 447 (Tenn. Crim. App. 1995). "Challenges to jury instructions present mixed questions of law and fact; therefore, we review challenged instructions de novo without a presumption of correctness." State v. Smith, 492 S.W.3d 224, (Tenn. 2016) (citing State v. Rush, 50 S.W.3d 424, 427 (Tenn. 2001)).

### 1. Voluntary Intoxication

The record reflects that after the State closed its case-in-chief but before the defense presented proof, the trial court allowed the parties to examine the prospective jury instructions and suggest changes. Defense counsel stated that he had "seen other cases or instructions where [the] instruction for second degree [murder] had included some language about passion but provocation that's not adequate. . . . I would ask you to insert some language that passion could play a role in second-degree murder, but where the provocation would not be sufficient." The trial court responded that it was using the pattern jury instruction for second degree murder but that it would consider altering the instruction if defense counsel would supply case law. The trial court gave defense counsel time to research the issue, but defense counsel did not provide any case law in support of his argument.

The trial court asked if defense counsel had any further suggestions. Defense counsel responded that he had "no problem with the pattern jury instruction for the defense of intoxication," noting that the defense intended to prove the Appellant was voluntarily intoxicated by smoking marijuana. The State objected, arguing that the issue was not whether the Appellant was intoxicated but whether the intoxication affected his ability to form a mental state. The trial court stated that it would consider the issue after the defense presented proof.

After the defense closed its proof, the trial court revisited the issue of the jury instructions. Defense counsel argued that the trial court should give the voluntary intoxication instruction, especially in a first degree murder case, when the accused presented proof of intoxication. Defense counsel noted that the Appellant testified that he was high and "not thinking straight." The trial court responded that in State v. Cameron Cook, No. E2012-02617-CCA-R3-CD, 2014 WL 689688 (Tenn. Crim. App. at Knoxville, Feb. 21, 2014), this court stated that proof of intoxication alone did not require an instruction on voluntary intoxication. This court also stated proof must exist that the intoxication deprived the accused of the mental capacity to form the specific intent to commit the crime. The trial court then said:

> So we have here proof that the [Appellant] was smoking marijuana. He did not testify that it prevented him from being able to form any type of specific intent. He said that he felt high. He used the word "confused" at times, but he never once, even in his direct examination, demonstrated that he wasn't able to form intent on what he was doing. The defense [it] seemed to me was being presented was that he did this because he was upset. He just found out his girl had been raped by this particular person.

And so even though he's testified that he smoked marijuana that day, the Court doesn't find that there was any evidence that he was, in fact, intoxicated by it, and certainly there wasn't evidence that he was deprived of the ability to form the requisite specific intent of first-degree intentional premeditated murder here. . . . I don't think there's sufficient evidence here for the Court to instruct on that.

Tennessee Code Annotated section 39-11-503(a) provides that voluntary "intoxication itself is not a defense to prosecution for an offense. However, intoxication . . . is admissible in evidence, if it is relevant to negate a culpable mental state." "Proof of voluntary intoxication is therefore akin to proof of a mental disease or defect that prevents a defendant from forming the culpable mental state required for the offense under consideration." State v. Hatcher, 310 S.W.3d 788, 814 (Tenn. 2010). Our supreme court has explained that

"[p]roof of intoxication alone is not a defense to a charge of committing a specific intent crime nor does it entitle an accused to jury instructions . . . ; there must be evidence that the intoxication deprived the accused of the mental capacity to form specific intent. . . . The determinative question is not whether the accused was intoxicated, but what was his mental capacity."

Id. (footnote omitted) (quoting Harrell v. State, 593 S.W.2d 664, 672 (Tenn. Crim. App. 1979)); see Cook, No. E2012-02617-CCA-R3-CD, 2014 WL 689688, at *8 (citing Hatcher, 310 S.W.3d at 814; Ben Mills v. State, No. W2005-00480-CCA-R3-PC, 2006 WL 44381, at *8 (Tenn. Crim. App. at Jackson, Jan. 5, 2006)).

We agree with the trial court that the Appellant did not present any proof that the marijuana he smoked impacted his ability to form the mental state required for first degree murder. Hamilton acknowledged that the Appellant, the victim, and she smoked marijuana on the day of the shooting. The Appellant contends that Hamilton testified that the Appellant was "non-responsive" immediately prior to the shooting. From the Appellant's citation to the record in support of this contention, we believe he was referring to Hamilton's testimony that the Appellant stared at her while she was sweeping and told her that nothing was wrong. Hamilton never stated that either she or the Appellant were "high." The Appellant testified that he smoked seven or eight marijuana "blunts," that he was "high," and that the marijuana made him feel confused. Nevertheless, he testified that he was having "a lot of emotions" because he initially did not believe Williams's rape accusation and that he was "upset" with the victim because he was acting "jerky." The Appellant said that he "just reacted." The Appellant testified

in detail about what happened that day, and no testimony was presented suggesting that the Appellant was incoherent or that his ability to form a mental state was impacted by the marijuana. Instead, the Appellant said that he shot the victim because the victim "raped [his] girl." Therefore, we conclude that the trial court did not err by refusing to give the instruction regarding voluntary intoxication. See Hatcher, 310 S.W.3d at 814; Cook, No. E2012-02617-CCA-R3-CD, 2014 WL 689688, at *8; State v. Christopher R. Pierce, No. M2005-01708-CCA-R3-CD, 2006 WL 2069415, at *9 (Tenn. Crim. App. at Nashville, July 26, 2006).

## 2. Second Degree Murder

The Appellant contends the trial court should have instructed the jury that second degree murder was "homicide committed under the 'heat of passion' without adequate provocation." The Appellant contends his testimony that he had "a lot of emotions running through him" and that he was "sad, upset, angry, [and] mad" justified the instruction. The Appellant complains that the jury instructions did not inform the jury "what crime is committed when a killing results from a state of passion produced by **in**adequate provocation." The Appellant contends:

> If the jury rejected voluntary manslaughter, with its language about a state of passion produced by adequate provocation, then the jury may well have concluded that it had to return a verdict of first-degree murder, because the definition of second-degree murder did not expressly contemplate a killing in a state of passion without adequate provocation. Thus, it was error for the trial court to deny the [Appellant's] request to charge the jury that second-degree murder also included killing which resulted from a state of passion produced by inadequate provocation.

The State responds that the trial court correctly instructed the jury regarding second degree murder.

Initially, we note that the Appellant failed to cite any authority in support of his contention that the instruction given regarding second degree murder was not proper. Generally, "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); see also Tenn. R. App. P. 27(a)(7). Nevertheless, we will address the merits of the Appellant's complaint.

The trial court instructed the jury on the charged offense of first degree murder and informed the jury that it was to consider second degree murder only if it found the

Appellant not guilty of first degree murder.  See State v. Davis, 266 S.W.3d 896, 904 (Tenn. 2008) (approving the use of "acquittal-first" sequential jury instructions).  Thus, by finding the Appellant guilty of first degree murder, the jury implicitly never considered the instruction on second degree murder.

Regardless, our supreme court has cautioned that "the constitutional right to a correct and complete charge of the law includes the right to jury instructions on each and every lesser-included offense embraced within the charged offense(s) and supported by the proof."  Id. at 902 (internal quotation marks and citation omitted).  In the instant case, the trial court instructed the jury:

> For you to find the [Appellant] guilty of [second degree murder], the [S]tate must have proven beyond a reasonable doubt the existence of the following essential elements, and there are two:
>
> One, that the [Appellant] unlawfully killed [the victim]; and two, that the [Appellant] acted knowingly.
>
> . . . .
>
> The distinction between voluntary manslaughter, which I'll read to you in just a moment, and [second degree murder] is that voluntary manslaughter requires that the killing result from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.  Passion is any of the human emotions known as anger, rage, sudden resentment, or terror which render the mind incapable of cool reflection.
>
> . . . .
>
> . . . For you to find the [Appellant] guilty of [voluntary manslaughter], the [S]tate must have proven beyond a reasonable doubt the existence of the following essential elements, and there are three:
>
> One, that the [Appellant] unlawfully killed [the victim]; and two, that the [Appellant] acted intentionally or knowingly; and three, that the killing resulted from a state of passion produced by adequate provocation sufficient to lead a reasonable person to act in an irrational manner.

The instructions mirror the statutory definitions of the charged offenses. Tenn. Code Ann. §§ 39-13-210(a)(1); 39-13-211(a). Further, the instructions given by the trial court substantially comported with the pattern jury instructions for second degree murder and voluntary manslaughter. T.P.I.-Crim. 7.05(a), 7.06(a). This court has previously found the language in the pattern instructions to be "clear and unambiguous." State v. Paul Clifford Moore, Jr., No. E2015-00585-CCA-R3-CD, 2016 WL 2865759, at *10 (Tenn. Crim. App. at Knoxville, Jan. 20, 2016), perm. to appeal denied, (Tenn., Sept. 22, 2016); see also State v. Billie Jo Welch, No. E2005-02293-CCA-R3-CD, 2006 WL 2737830, at *14 (Tenn. Crim. App. at Knoxville, Sept. 26, 2006); State v. Ezell Wallace, No. W2002-00266-CCA-R3-CD, 2003 WL 21643219, at *16 (Tenn. Crim. App. at Jackson, July 14, 2003). We have examined the jury charge as a whole, and we conclude that the jury was properly instructed on the offenses of second degree murder and voluntary manslaughter. The trial court did not err in denying the requested instruction. This issue is without merit.

## C. Sufficiency of the Evidence

The Appellant argues that the verdict was contrary to the weight of the evidence and the trial court, acting as thirteenth juror, should have overturned the verdict. This court has observed that once the trial court has approved the verdict as the thirteenth juror, as it has in this case, our appellate review is then limited to determining the sufficiency of the evidence. See State v. Burlison, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993).

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn.

Crim. App. 1999). Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

In order to obtain the Appellant's conviction for first degree premeditated murder, the State was required to prove, beyond a reasonable doubt, that the Appellant committed the "premeditated and intentional killing of [the victim]." Tenn. Code Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Id. at (d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Specifically, the following factors have been used to support a jury's inference of premeditation: (1) the defendant's prior relationship to the victim which might suggest a motive for the killing; (2) the defendant's declarations of intent to kill; (3) the defendant's planning activities before the killing; (4) the manner of the killing, including the defendant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; (5) the defendant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See id. at 914-915; State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

In the light most favorable to the State, the proof adduced at trial revealed that the Appellant had been staying at Hamilton's apartment for a couple of days without incident. On the day of the shooting, Hamilton, the victim, and the Appellant were together, smoking marijuana. They did not have any problems until the Appellant received a call from his girlfriend, Williams. Upon learning that the Appellant was with the victim, Williams accused the victim of raping her and accused the Appellant of being "with her enemies." After the call, Hamilton and the victim left the apartment to visit a friend and returned shortly thereafter. Hamilton told the Appellant that he needed to leave the apartment, and he agreed. Hamilton walked into her bedroom. The Appellant reached under the couch cushion, grabbed his gun, which was loaded with six .38 caliber hollow-point bullets, and followed her. The victim was standing in front of the closet in the bedroom. The Appellant began shooting at the unarmed victim, and Hamilton locked herself in the bathroom. The Appellant fired five shots; one bullet pierced the victim's face and multiple bullets pierced his back. The Appellant then left the apartment. Shortly thereafter, Officer Heitz found the Appellant at a nearby apartment complex, having a telephone conversation with his mother. When the officer told the Appellant to end the call, the Appellant said, "'I've got to go, Mom. They've got me.'" When the

Appellant was arrested, the police took his gun. Testing revealed that the bullets retrieved from the victim's body during autopsy had been fired from the Appellant's gun.

The Appellant does not dispute that he shot the victim. He contends, however, that he did not possess the requisite intent to commit first degree murder, asserting that he was under the influence of marijuana. He maintains that Hamilton testified about his "non-responsive nature . . . after he heard that his girlfriend had been raped" by the victim, which he argues supports his theory that he was under the influence at the time of the shooting. The jury heard the proof adduced at trial and determined that the Appellant was capable of forming the intent to kill the victim. The Appellant acknowledged that he was upset with the victim because he thought the victim had raped "his girl." He shot repeatedly at an unarmed victim, striking the victim multiple times in the back. Moreover, the Appellant did not seem emotional when he was arrested shortly after the offense. We conclude that the proof was sufficient for a reasonable jury to find the Appellant guilty of first degree premeditated murder.

### D. Cumulative Error

Finally, the Appellant claims that the trial court's cumulative errors warrant the reversal of his conviction. However, having found that the trial court committed no errors that warrant reversal of the Appellant's conviction, there is no merit to this claim.

### III. Conclusion

Based upon the foregoing, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE